BORDEN, INC., Plaintiff–Appellee,

v.

BAKERY & CONFECTIONERY UNION
& INDUSTRY INTERNATIONAL
PENSION;

Board of Trustees of the Bakery and Confectionery Union Industry International Pension Fund, Defendants–Appellants.

BORDEN, INC., Plaintiff–Appellant,

v.

BAKERY & CONFECTIONERY UNION
& INDUSTRY INTERNATIONAL
PENSION;

Board of Trustees of the Bakery and Confectionery Union Industry International Pension Fund, Defendants–Appellees.

Nos. 91–1787, 91–1788.

United States Court of Appeals,
Fourth Circuit.

Argued April 6, 1992.

Decided Sept. 4, 1992.

Julia Penny Clark, Bredhoff & Kaiser, Washington, D.C., argued (John M. West, on brief), for defendants-appellants.

Baruch Abraham Fellner, Gibson, Dunn & Crutcher, Washington, D.C., argued (Peter H. Turza, Derry Dean Sparlin, Jr., on brief), for plaintiff-appellee.

Before SPROUSE and NIEMEYER, Circuit Judges, and KIDD, Senior United States District Judge for the Northern District of West Virginia, sitting by designation.

OPINION

NIEMEYER, Circuit Judge:

The Multiemployer Pension Plan Amendments Act of 1980, Pub.L. No. 96–364, 94 Stat. 1208 (1980), established the "withdrawal liability" of an employer withdrawing from a multiemployer pension plan to recoup the employer's proportional share of the plan's present shortfall in the funding of its vested pension benefits. The narrow question presented on this appeal is wheth-

er the statutorily directed method for computing an employer's partial withdrawal liability must take into account any historical funding obligations that were attributable to the employer's subsidiary, previously sold by the employer in compliance with 29 U.S.C. § 1384 (recognizing that a sale of assets under specified conditions transfers funding obligations to the purchaser). For the reasons hereafter given, we hold that the sale of a subsidiary satisfying the conditions of § 1384 effects a transfer of the subsidiary's contribution history to the purchaser and removes it from further consideration in the computation of the seller's withdrawal liability for later withdrawals. On this point, therefore, we affirm the ruling of the district court.

We are also presented with the question of whether interest may be assessed on the amount of the withdrawal liability for the plan year within which withdrawal occurs. Because we find nothing in the Act authorizing such an assessment of interest, we conclude that the assessment in this case was inappropriate and therefore reverse the district court's decision on this point.

# I

## A

After conducting a long-term and detailed study of private pension plans, Congress in 1974 enacted the Employee Retirement Income Security Act (ERISA), Pub.L. No. 93–406, 88 Stat. 829 (1974), establishing a comprehensive and complex scheme for regulating such plans. Among the principal objectives of ERISA was the development of a system that would guarantee that promised benefits be paid to those workers who had met the conditions required to attain a "vested" status within the terms of the plan. *See Nachman Corp. v. Pension Benefit Guaranty Corp.*, 446 U.S. 359, 361–62, 100 S.Ct. 1723, 1726, 64 L.Ed.2d 354 (1980). By 1980, however, it became clear to Congress that ERISA's scheme for multiemployer plans contained some structural defects which threatened the plans' ability to maintain and ensure funding of vested benefits. The statute lacked a mechanism to protect a multiemployer plan from losses occasioned by an employer-participant's decision to terminate participation in, or to withdraw from, the plan without having fully funded future claims against the plan. The difficulty was perhaps best described by the Executive Director of the Pension Benefit Guaranty Corporation in his testimony to Congress:

> A key problem of ongoing multiemployer plans, especially in declining industries, is the problem of employer withdrawal. Employer withdrawals reduce a plan's contribution base. This pushes the contribution rate for remaining employers to higher and higher levels in order to fund past service liabilities, including liabilities generated by employers no longer participating in the plan, so-called inherited liabilities. The rising costs may encourage—or force—further withdrawals, thereby increasing the inherited liabilities to be funded by an ever-decreasing contribution base. This vicious downward spiral may continue until it is no longer reasonable or possible for the pension plan to continue.

*Pension Benefit Guarantee Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 722 n. 2, 104 S.Ct. 2709, 2714 n. 2, 81 L.Ed.2d 601 (1984) (quoting Pension Plan Termination Insurance Issues: Hearings before the Subcommittee on Oversight of the House Committee on Ways and Means, 95th Cong., 2d Sess., 22 (1978) (statement of Matthew M. Lind)). *See also McDonald v. Centra, Inc.*, 946 F.2d 1059, 1062 (4th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 2325, 119 L.Ed.2d 244 (1992). Thus it was perceived that the failure in ERISA to discourage or prevent the "downward spiral" of withdrawals by employers would result in the inability of the plans to fund their obligations to vested pensioners.

In response, Congress enacted the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), Pub.L. No. 96–364, 94 Stat. 1208 (1980), establishing a mechanism by which an employer that decides to withdraw from a multiemployer pension plan incurs "withdrawal liability" intended to cover that employer's share of the unfunded vested benefits in existence at the time

of withdrawal. *See* 29 U.S.C. §§ 1381, 1391. In essence, the method of calculating withdrawal liability applicable to this case [1] aims to assign to the withdrawing employer a portion of the plan's unfunded obligations in rough proportion to that employer's relative participation in the plan over the last 5 to 10 years.[2] As a result, an employer gains no advantage vis-a-vis the pension fund from the act of withdrawal and, in the event of a withdrawal, those employers remaining in the plan do not become responsible for funding an inordinate share of the vested benefits that will become payable.

By thus imposing liability for complete and partial withdrawals from pension plans, the MPPAA ensures that a withdrawing employer pays a proportionate share of the pension plan's unfunded vested benefits. However, keeping in mind the ultimate goal of protecting plan integrity, in amending ERISA in 1980 Congress established other safeguards which interact with, and in some instances counteract, the effects of the withdrawal provisions. One example, relevant to this appeal, involves the application of 29 U.S.C. § 1384, which provides that no withdrawal shall occur where a participating employer undertakes a bona fide, arm's length sale of assets to an unrelated party, if the purchaser agrees, among other conditions, to assume the seller's obligations to contribute to the plan. *See* 29 U.S.C. § 1384. Section 1384 promotes plan continuity and growth by "ameliorat[ing] the imposition of employer withdrawal liability," *see Textile Workers Pension Fund v. Standard Dye & Finishing Co., Inc.,* 725 F.2d 843, 853 (2d Cir.), *cert. denied,* 467 U.S. 1259, 104 S.Ct. 3554, 82 L.Ed.2d 856 (1984), and providing an incentive for a withdrawing employer to sell its operations to another employer that will continue to make contributions to the plan on behalf of the employees at the sold facility. For purposes of determining the § 1384 purchaser's withdrawal liability at some time after the sale, the statute treats the purchaser "as if" it had been required to contribute to the plan in the plan year of the sale and the four preceding plan years [3] in the amount that the seller was required to contribute, thus shifting primary liability from the seller to the purchaser. *See* 29 U.S.C. § 1384(a), (b).

It is the interrelationship between § 1391, establishing the means for calculating employer withdrawal liability, and § 1384, precluding the assessment of withdrawal liability under specified circumstances, each reflecting an attempt by Congress to preserve the viability of the nation's pension funds, which forms the basis of the principal issue now before us.

1. The MPPAA sets forth four alternative methods by which multiemployer pension plans can calculate withdrawal liability. *See* 29 U.S.C. §§ 1391(b), (c). The Fund in this case has adopted the "modified presumptive" or "two-pool" method described in § 1391(c)(2).

Pursuant to 29 U.S.C. § 1461(e), the withdrawal liability provisions took effect on September 26, 1980. In allocating responsibility for funding the pre–1980 unfunded vested benefits, Congress made some difficult choices, which are not directly relevant to the issues before us on this appeal. Although Borden must, in accordance with the scheme Congress established, fund a share of the pre–1980 liability as part of its partial withdrawal from the plan, the mechanism for assigning that liability and for adjusting allocation of the post–1980 withdrawal liability to account for the separate treatment of the pre–1980 pool, are not in dispute here. Accordingly, in this opinion we shall, where possible, attempt to simplify the equations by treating this case as if there were no pre–1980 unfunded vested benefits.

2. In determining an employer's relative share of the plan's unfunded vested benefits upon withdrawal, the MPPAA looks at the withdrawing employer's required payments under the plan as compared with the total amount of contributions under the plan by all employers. *See* 29 U.S.C. § 1391(c)(2)(C). The relevant time frame for making this comparison is the five plan years prior to the employer's withdrawal. *Id.* However, the MPPAA permits a pension fund to elect to extend its consideration of the employer's contribution history from 5 to 10 plan years. *See* 29 U.S.C. § 1391(c)(5)(C). As shall become evident, the reconciliation of the exercise of this option with other MPPAA requirements gives rise to the dispute in this case.

3. The withdrawal liability sections of the Act refer to "plan years" rather than calendar years, and we recognize that one of the plan years relevant to this case is less than 12 months. For the sake of simplicity, however, we often refer to "years" rather than "plan years" without intending any distinction.

### B

The Bakery and Confectionery Union and Industry International Pension Fund is a multiemployer pension plan established and maintained in accordance with ERISA, for the purpose of providing retirement related benefits to eligible fund participants. Borden, Inc., and its subsidiaries have been parties to a number of collective bargaining agreements that require contributions to the Fund on behalf of employees at several different facilities.[4]

By contract dated July 30, 1986, Borden sold all of the assets of one of its participating subsidiaries, Drake Bakeries, to Continental Baking Company. As a consequence of the sale, which was approved by the Fund as a qualifying "asset sale" under 29 U.S.C. § 1384, Continental became obligated to make contributions to the Fund on behalf of the employees at Drake, and Borden became secondarily liable in the event that Continental failed to comply with its obligations in the first five years following the sale. *See* 29 U.S.C. § 1384(a)(2) & (3). Accordingly, Borden incurred no withdrawal liability at the time of the sale, despite the termination of its own primary obligation to make contributions to the Fund on behalf of Drake employees. Through the date of a stipulation of facts filed by the parties in this case, contributions continued to be made under the plan on behalf of Drake employees.[5]

A little more than a year later, on November 9, 1987, Borden notified the Fund

that it was in the process of closing facilities operated by two of its subsidiaries, Laura Scudders and Western Globe Products, for which contributions to the Fund had been made. All of the Western Globe production and about 98% of that of Laura Scudders were being transferred to other facilities operated by Borden that did not participate in the Fund. Based on this information, the Fund determined that because Borden's obligation to contribute at those two facilities was ceasing, Borden would incur partial withdrawal liability.[6] After a number of revisions and alterations in its method for calculating withdrawal liability, the Fund determined that the portion of Borden's share of the unfunded vested benefits represented by Laura Scudders and Western Globe amounted to $757,803. The Fund assessed Borden that amount for its withdrawal liability, as well as interest of $53,046 for 1988, the year in which withdrawal took place.

To calculate Borden's partial withdrawal liability, the Fund first calculated Borden's liability as if it withdrew completely, and then reduced this amount by the proportion of Borden's facilities remaining in the plan. *See* 29 U.S.C. § 1386. The Fund ascertained Borden's share of the Fund's post–1980 unfunded obligations—what Borden's withdrawal liability would be if it withdrew completely—by multiplying the amount of the Fund's total unfunded vested benefits by a fraction obtained by dividing the amount of contributions required to be

---

4. Under 29 U.S.C. § 1301(b), "all employees of trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a single employer and all such trades and businesses as a single employer." Those subsidiaries on whose behalf Borden contributed to the Fund during the relevant time frame include: Gioia Macaroni, Merlino's Macaroni, Viviano Macaroni, Old London Foods, Meadow Gold Supreme Ice Cream, Red Seal Quality Foods, Laura Scudders, Western Globe Products, and Drake Bakeries.

5. Just over a year after Borden sold the assets of Drake Bakeries to Continental, a subsidiary of Ralston Purina Company, Ralston transferred Drake, through a sale of stock, to Rock Capital Partners, L.P., which continued to make contributions to the Fund on behalf of Drake employees through the date of the stipulation. Follow-

ing the arbitration in this case, Drake was again sold, through a sale of assets, to Culinar, Inc. Apparently, one of Drake's facilities was then scheduled to close by the end of 1991. Brief for Appellant at 11 n. 4.

6. A partial withdrawal generally occurs when there is a partial cessation of the employer's obligation to contribute or a 70% decline in contributions. *See* 29 U.S.C. § 1385(a). The Fund initially determined that the partial withdrawal occurred during calendar year 1987. In its subsequent request for review of the Fund's initial demand, Borden questioned this conclusion, and, ultimately, the parties compromised by stipulating that a single partial withdrawal would occur with respect to both Laura Scudders and Western Globe on December 31, 1988, pursuant to 29 U.S.C. § 1385(b)(2)(A)(i).

made by Borden on behalf of its participating subsidiaries during the ten plan years ending on December 31, 1987, by the total contributions made by all employers under the plan over that same period.[7] *See* 29 U.S.C. §§ 1391(c)(2)(C) & 1391(c)(5)(C).

In determining the numerator of this fraction, the amount of Borden's past required contributions, the Fund did not include the contributions required to be made by Borden on behalf of Drake Bakeries during the year of the sale of Drake's assets to Continental or in the four years before that, in accordance with the Fund's understanding that § 1384 assigns that liability to Continental. Yet the Fund did consider the contributions required to be made by Borden on Drake's behalf in the years prior to that, the so-called "pre-five-year period." Presumably, the Fund also included all contributions actually made on behalf of Drake in the ten plan years prior to December 31, 1987, as part of the denominator intended to include roughly the total amount contributed under the plan by all employers during the period under consideration. *See* § 1391(c)(2)(C)(ii)(II). Had the Fund chosen not to attribute to Borden any payments required to be made by it on behalf of Drake, we are told that the final withdrawal liability of Borden would have been only $102,461.

At Borden's demand, the case was submitted to arbitration, largely on the basis of stipulated facts. The arbitrator determined that the Fund properly included Drake's pre-five-year contribution history in computing Borden's partial withdrawal liability, but ruled against the Fund on the issue of interest, which led both parties to seek review by the district court pursuant to 29 U.S.C. § 1401(b)(2). On cross-motions for summary judgment, the district court held that all of Drake's contribution history must be excluded from the calculation of Borden's partial withdrawal liability. The

court noted that to hold otherwise "would eviscerate the meaning and purpose of [§ 1384]." The court also reinstated the Fund's claim for interest. This appeal and cross-appeal followed.

## II

■ The primary difficulty presented in this appeal arises from the Fund's legitimate decision to take advantage of its option under 29 U.S.C. § 1391(c)(5)(C), which allows the Fund to consider as many as ten years of contribution history in determining a withdrawing employer's share of the Fund's unfunded vested benefits. If the Fund had not elected to do so, then its examination would have extended back five years from December 31, 1987, *see* 29 U.S.C. § 1391(c)(2)(C); the payments actually made by Borden on Drake's behalf in the several years prior to the sale of Drake to Continental in 1986 would have been attributed to Continental under the plain language of 29 U.S.C. § 1384(b), stating:

> For purposes of this part [regarding "Employer Withdrawals"] the liability of the purchaser shall be determined as if the purchaser had been required to contribute to the plan in the year of the sale and the 4 plan years preceding the sale the amount the seller was required to contribute for such operations for such 5 plan years[;]

and no dispute would have arisen. However, by extending its examination of the Fund's contribution history an additional five years, the Fund raises the question: For the purposes of calculating withdrawal liability, to whom, if anyone, does the MPPAA assign that portion of the withdrawal liability which is based on the pre-five-year contribution history of a subsidiary sold under § 1384?

---

7. Actually, the calculations are more complicated. Based on the withdrawal liability calculation method used by the Fund, and because Borden is subject to liability for pre–1980 deficits, *see supra* note 1, the calculation of Borden's share of the Fund's existing vested benefits which exceeded assets in hand first involved a determination of Borden's share of the pre–1980

unfunded vested benefits in accordance with 29 U.S.C. § 1391(c)(2)(B). Then, in addition to that amount, Borden's share of the Fund's post–1980 unfunded vested benefits was determined, roughly as we have described, although taking into account several other factors not applicable to our discussion. *See* 29 U.S.C. § 1391(c)(2)(C).

Our task thus is to synthesize the withdrawal liability provisions of the MPPAA, including § 1391(c)(5)(C) which permits consideration of a ten-year contribution history, and § 1384, which forestalls the effect of a withdrawal and shifts to the purchaser the contribution history of an asset sold pursuant thereto, but only does so expressly to the extent of five years. And in so doing, in the absence of explicit legislative directions, we must determine how to treat that portion of the contribution history of assets sold pursuant to § 1384, which lies beyond the five years explicitly shifted to the purchaser but within the optional ten-year window of consideration under § 1391(c)(5)(C).

The Fund argues that, because § 1384 relieved Borden of only *immediate* withdrawal liability when it sold Drake, the contribution history for Drake, except for the five years explicitly shifted, should remain attributable to Borden for the purpose of calculating any subsequent withdrawal liability under 29 U.S.C. § 1391(c)(2). Since the Fund expressly adopted a plan provision pursuant to § 1391(c)(5)(C) to consider a ten-year contribution history, the Fund argues that a strict interpretation of the MPPAA requires that any portion of Drake's contribution history earlier than the five years attributable to Continental under § 1384 be attributed to Borden for purposes of calculating Borden's withdrawal liability. There is support for such an interpretation in the language of both § 1384 and § 1391.

Section 1391(c)(2)(C)(ii) defines a fraction, the numerator of which is "the total amount required to be contributed under the plan by the employer," i.e. the funding obligation, and the denominator of which essentially is the "total amount contributed under the plan by all employers," for the purpose of computing an employer's share of the plan's unfunded vested benefits. A literal interpretation of this provision applied to this case would require inclusion of *all* funding obligations, even those incurred on Drake's behalf during the applicable ten years, despite the sale of Drake to Continental in 1986, since those obligations are part of the total amount Borden was re-

quired to satisfy under the plan. Because five of those years of obligations incurred on Drake's behalf would also be used to calculate Continental's liability in the event it withdraws, *see* 29 U.S.C. § 1384(b), this literal interpretation leads to a potential double recovery by the Fund for obligations attributable to Drake.

Because it is generally accepted that Congress did not intend these two provisions, working together, to result in a potential double recovery by the Fund, *cf. Morrison–Knudsen Constr. Co. v. Director, OWCP*, 461 U.S. 624, 637 n. 14, 103 S.Ct. 2045, 2052 n. 14, 76 L.Ed.2d 194 (1983) (rejecting statutory construction that would result in double recovery, based on understanding that Congress would not have so intended), the Fund argues that § 1391(c)(2)(C)(ii)(I) (defining the numerator) does not require what it literally says, but only that Borden be attributed with the total amount required to be contributed by it under the plan, *except* for that portion treated by § 1384(b) as if it had been required to be paid by Continental. This next-most literal interpretation, which reflects a rational attempt at giving all of the MPPAA's provisions their maximum effect, is appealing. *See United States v. Menasche*, 348 U.S. 528, 538–39, 75 S.Ct. 513, 519–20, 99 L.Ed. 615 (1955) (relying on the cardinal principle of statutory construction that courts " 'give effect, if possible, to every clause and word of a statute.' ") (quoting *Montclair v. Ramsdell*, 107 U.S. (17 Otto.) 147, 152, 2 S.Ct. 391, 395, 27 L.Ed. 431 (1882)). But, Borden argues, the Fund's strict interpretation of § 1391 fails to give adequate effect to the MPPAA's moderating provisions, including § 1384.

Section 1384(a)(1) provides that no withdrawal shall "occur solely because, as a result of a bona fide, arm's-length sale of assets to an unrelated party . . ., the seller ceases covered operations or ceases to have an obligation to contribute for such operations," provided that certain safeguarding conditions are satisfied. *See* 29 U.S.C. § 1384(a)(1)–(3). As we have discussed above, the provision furthers the purpose of the MPPAA to promote plan continua-

tion and growth by encouraging an employer to sell its operations to another employer that will continue to fund the plan, rather than to withdraw. If the purchaser withdraws following the sale, its liability is determined as if it had been required to contribute to the plan in the year of the sale and the four years preceding the sale in the amount the seller was required to contribute, thus shifting primary withdrawal liability for those years from the seller to the purchaser. *See* § 1384(b). The seller remains only secondarily liable, in the event that the purchaser withdraws in the first five plan years after the sale and the purchaser fails to make its withdrawal liability payments when due. *See* § 1384(a)(2). If a sold facility constitutes the seller's only covered operation, the § 1384 sale relieves the seller of all primary withdrawal liability under the plan, and the plan would only be able to use the seller's pre-five-year contribution history to compute the seller's secondary withdrawal liability arising because the purchaser failed to comply with the conditions of the sale. Thus, had Borden owned only Drake and sold that asset as it did in 1986, Borden would have incurred no withdrawal liability with respect to Drake, unless Continental had reneged on its agreement and withdrawn Drake from the Fund within five years after the purchase.

We consider that result to be entirely consistent with the meaning and purpose of § 1384, and we see no reason to reach a different result when the sold facility constitutes only part of the seller's covered operations. Indeed, a different result could undercut the purpose of § 1384 by minimizing the incentive of an employer to engage in a § 1384 transaction rather than to withdraw from a pension plan. While we do not pretend that the attribution of the pre-five-year contribution history to the seller without the purchaser's violation of the § 1384 conditions will necessarily thwart the objectives of § 1384 in every case, the facts of this particular case may suggest otherwise. If the figures provided to us are accurate, the inclusion of Drake's pre-five-year history in calculating Borden's withdrawal liability alters the out-

come by more than $650,000, a sum that could have some impact on an employer's decision whether to undertake the effort and expense of attempting to locate and negotiate with a purchaser willing to comply with the requirements of § 1384.

The Fund argues that focusing exclusively on the fulfillment of the purposes of § 1384 ignores their effect on the congressional objectives inherent in § 1391. Congress enacted the withdrawal liability provisions in the MPPAA with the expressed desire to discourage withdrawals by employers and to protect the vested benefits of employees from the potential result of such withdrawals. As the Fund points out, the ratio established in § 1391(c)(2)(C)(ii), for the purpose of determining a withdrawing employer's share of a plan's post–1980 unfunded vested benefits, reflects an attempt to assign *all* of a plan's unfunded obligations existing at the time of withdrawal (at least conceptually) to the various plan participants. Thus, if every participant were to withdraw in the same year, all of the plan's vested benefits would be funded by the members' withdrawal payments on a pro rata basis. Additionally, § 1391(c)(5)(C) allows plans to expand the consideration of a withdrawing employer's contribution history more than five years, in order to protect the funds better from the potential result of a shorter-term calculation.

But, continues the Fund, the decision to relieve Borden of its share of the unfunded vested benefits that is represented by the contributions made by it on behalf of Drake during the pre-five-year period not only deprives the Fund of the power to consider Borden's full ten-year contribution history, but also necessarily thwarts the congressionally devised mechanism for assigning withdrawal liability based on the attribution to someone of all unfunded vested liabilities in existence at the time of withdrawal. We agree that, given the overarching concern of Congress in establishing a system for protecting vested benefits, the effect of our interpretation on the scheme established deserves careful attention. However, we believe it possible to

interpret the MPPAA in such a way as to advance the objectives of both § 1384 and § 1391.

In arguing that the failure to assign Drake's pre-five-year contribution history to Borden will work contrary to the mechanism established by Congress to protect pension plans, the Fund assumes that a determination that those years are not attributable to Borden necessarily means that Continental must assume that liability or else it will be attributable to no one. A cornerstone of that argument is the Fund's understanding that § 1384 cannot be construed to require an implicit attribution of all of Drake's contribution history to the purchaser, Continental. It is true that the language of § 1384, its legislative history, and the recognized purpose of that section appear to point away from assigning the pre-five-year contribution history to Continental. *See* § 1384(b) (mentioning only plan year of sale and preceding four plan years while describing purchaser's liability); *cf.* H.R.Rep. No. 869, 96th Cong., 2d Sess. 77, *reprinted in* 1980 U.S.C.C.A.N. 2918, 2945 (MPPAA is designed to "protect[ ] newly entering employers from unfunded liabilities built up before they entered the plan, in order to reduce the fears of prospective contributors caused by the current allocation rules.").

However, even assuming that the method for calculating *Continental's* withdrawal liability precludes consideration of Drake's pre-five-year history, that does not necessarily result in the conclusion that the calculation of *Borden's* withdrawal liability must necessarily include the five years not attributed to Continental. As we have explained, the establishment of a scheme of primary and secondary liability under § 1384 and the stated intent of Congress to encourage § 1384 sales supports the conclusion that Drake's contribution history should shift entirely from Borden.

Instead, we read § 1384 to preclude consideration of Drake's pre-five-year contribution history for the purpose of calculating any employer's withdrawal liability. This interpretation, which recognizes that a § 1384 asset's contribution history shifts to the purchaser without the ability of the Fund to consider that history beyond the limitations expressed in § 1384, in our view simply reflects a conclusion that Congress did not intend to saddle the § 1384 purchaser with the full cost of encouraging the participant-employer to conduct such a sale.

This interpretation does not work to the ultimate disadvantage of the Fund, in terms of remaining faithful to the congressional mechanism for calculating withdrawal liability. It is true that by excluding Drake's pre-five-year history from consideration in the event of a withdrawal by any employer, the amounts contributed by Borden on Drake's behalf are not considered attributable to Borden in the event it withdraws from the Fund. However, those funds are also not treated as if they were attributable to Borden in calculating withdrawal liability for any *other* Fund participant. For the funds actually contributed on Drake's behalf in those years will also be excluded from consideration in determining the total amount contributed by all employers under the plan in the last ten years, which forms the basis for determining a withdrawing employer's share of the existing unfunded vested benefits. *See* 29 U.S.C. § 1391(c)(2)(C)(ii)(II) & (5)(C). Accordingly, when calculating Borden's withdrawal liability, all unfunded vested benefits existing at the time of Borden's withdrawal are covered pro rata by Borden's withdrawal payment and conceptual allocation to the other, active plan participants.

This combination, reading a complete transfer of responsibility for Drake to Continental with a limitation on the Fund's ability to consider contributions made on Drake's behalf beyond the limits set in § 1384, we believe thus serves the MPPAA's twin goals of maintaining fund stability by encouraging § 1384 sales of assets and establishing a system of withdrawal liability whereby all post–1980 unfunded vested benefits are, at least conceptually, assigned to active plan members based upon their relative participation. While this reconciliation of § 1384 and § 1391 results in a potential benefit to the participants in a § 1384 transaction at

some expense to the other plan members, it avoids the potential of double recovery by the plan and enables the scheme chosen by Congress for the purpose of determining withdrawal liability to work as intended.

In summation, we therefore hold that no part of the contribution history (including the pre-five-year portion) attributable to assets previously sold in accordance with 29 U.S.C. § 1384 is to be considered for the purpose of calculating a seller's subsequent withdrawal liability. The district court's decision, that Borden's withdrawal liability should not have been based in part upon contributions made by Borden on behalf of Drake Bakeries, is therefore affirmed.

### III

█ On its cross-appeal, Borden argues that the district court erred in permitting the Fund to assess "gap year" interest in accordance with *Huber v. Casablanca Indus., Inc.,* 916 F.2d 85 (3d Cir.1990), *petition for cert. filed,* 59 U.S.L.W. 3503 (U.S. Jan. 22, 1991) (No. 90–1092). After calculating Borden's withdrawal liability based upon the ten-year period ending December 31, 1987, the Fund determined the number of monthly payments necessary to amortize the estimated liability and included a 7% interest charge for the whole of 1988, the full year in which the partial withdrawal occurred. Borden challenged this assessment of "gap year" interest and the arbitrator concluded that the Fund was without statutory authority to charge Borden interest for 1988. The Fund appealed and the district court reversed the arbitrator's decision, concluding that the imposition of "gap year" interest is allowable under 29 U.S.C. § 1399.

The calculation of withdrawal liability is determined by 29 U.S.C. § 1391, which provides that in determining an employer's allocable share of unfunded vested benefits, the total unfunded vested benefits are calculated as of the last day of the year *preceding* that in which the employer withdraws. Once the employer's share of the unfunded vested benefits is ascertained, an amortization schedule must be determined. Section 1399(c)(1)(A)(i) provides:

[A]n employer shall pay the amount determined under section 1391 of this title . . . over the period of years necessary to amortize the amount in level annual payments determined under subparagraph (C), calculated as if the first payment were made on the first day of the plan year following the plan year in which the withdrawal occurs and as if each subsequent payment were made on the first day of each subsequent plan year. Actual payment shall commence in accordance with subparagraph (2).

Thus, if an employer withdraws in year 1, the amount of its liability is determined as of December 31, year 0. This liability amount is then amortized as if the first payment were to be made on January 1, year 2.

Borden withdrew from the Fund on December 31, 1988. After calculating its withdrawal liability, the Fund assessed interest for 1988, the "gap year," amounting to $53,046.

The MPPAA is silent on the issue of imposing interest during the year in which the employer withdraws. In light of the comprehensiveness and complexity of the MPPAA, this silence is telling. When a statute prescribes amounts and computations with as much detail and thoroughness as is the case with ERISA and fails to authorize interest during a specifically authorized delay in payment, we conclude that the omission was deliberate. *But see Huber v. Casablanca Indus., Inc.,* 916 F.2d at 98. This conclusion is buttressed by the Act's express authorization of assessing interest against an employer upon its default in making withdrawal liability payments. *See* 29 U.S.C. § 1399(c)(5). Because ERISA and MPPAA do not expressly authorize the assessment of "gap year" interest, we reverse the judgment of the district court on this point.

AFFIRMED IN PART AND REVERSED IN PART.