In the

# United States Court of Appeals

### For the Seventh Circuit

No. 10-2489

CENTRAL STATES, SOUTHEAST AND
SOUTHWEST AREAS PENSION FUND, and
HOWARD MCDOUGALL, Trustee,

*Plaintiffs-Appellants*,

*v.*

GEORGIA-PACIFIC LLC,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 09 C 1445—**Rebecca R. Pallmeyer**, *Judge*.

ARGUED FEBRUARY 9, 2011—DECIDED MARCH 29, 2011

Before EASTERBROOK, *Chief Judge*, and FLAUM and
RIPPLE, *Circuit Judges*.

EASTERBROOK, *Chief Judge*. Georgia-Pacific sold its
building-products division to BlueLinx Corp. in 2004.
After that sale, Georgia-Pacific no longer had any em-
ployees participating in the multiemployer Central
States, Southeast and Southwest Areas Pension Fund

("the Plan"). Withdrawal from a multiemployer fund requires a payment if the fund does not have enough assets to meet all of its obligations. (If employers could withdraw freely from underfunded plans, everyone would have an incentive to do so and saddle remaining firms with the burden of meeting the pension promises. The result would be an unraveling of multiemployer plans.) The Plan is underfunded, but Georgia-Pacific contended that it does not owe withdrawal liability. It relied on 29 U.S.C. §1384(a)(1), which provides that the employer need not pay if "solely because, as a result of a bona fide, arm's-length sale of assets to an unrelated party . . . , the seller ceases covered operations or ceases to have an obligation to contribute for such operations" and the purchaser not only assumes liability for the contributions but also posts a bond to ensure payment. The seller is secondarily liable for the first five years of the buyer's payments. 29 U.S.C. §1384(a)(1)(B). BlueLinx began contributing to the Plan and posted the bond; Georgia-Pacific stood behind its obligations.

The Plan maintains that Georgia-Pacific nevertheless owes about $5 million. When an employer and a multiemployer pension plan disagree about withdrawal liability, the dispute is referred to what the statute calls "arbitration." 29 U.S.C. §1401. (The usage may strike readers as irregular, because arbitration normally depends on contract. See *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995). There is nothing contractual or voluntary about §1401.) The arbitrator concluded that Georgia-Pacific does not owe withdrawal liability; on review under 29 U.S.C. §§ 1401(b)(2), 1451,

the district court enforced that award. 2010 U.S. Dist. LEXIS 8773 (N.D. Ill. Feb. 2, 2010).

The Plan contends that the sale to BlueLinx is not "solely" responsible for the fact that Georgia-Pacific no longer contributes. At the beginning of 1994 three divisions within Georgia-Pacific had employees on whose behalf the firm contributed to the Plan. During 1994 and 1995 Georgia-Pacific outsourced tasks that had been performed by workers in its wood-pulp division; it laid off workers in that division. This did not meet the statutory definition of partial withdrawal. 29 U.S.C. §1385. In 1997 Georgia-Pacific closed some facilities within its building division and laid off workers. This step did result in partial withdrawal, and Georgia-Pacific paid the Plan $81,585.62. Seven years later, Georgia-Pacific sold the building-products division to BlueLinx. As the Plan sees things, the end of Georgia-Pacific's contributions is attributable to the closures during the 1990s as well as to the sale in 2004, so that complete withdrawal did not occur "solely because . . . [of an] arm's-length sale of assets to an unrelated party".

Georgia-Pacific contends that the sale is "solely" responsible for withdrawal in the sense that, if it had not sold the division and everything else had remained the same, it would still be a contributing employer and would not owe the Plan anything. Section 1384 avoids windfalls to pension plans: If plans would not recover anything in the absence of a sale, and don't lose contributions because of the sale, then there is no reason why the Plan should receive a lump-sum payment. If, as the

Plan contends, the word "solely" in §1384(a) looks to events that precede the sale, why stop with the layoffs in 1994? The Plan could equally well contend that Georgia-Pacific would not have sold the division had not increased competition made the division less profitable. Or that Georgia-Pacific would not have sold the division in the absence of a decision by its board of directors to pare off operations that did not suit its business model. Yet it would not make sense to say that, because competition played a role in a decision to divest, the sale was not the "sole" cause of the fact that Georgia-Pacific no longer makes contributions. One might as well say that the withdrawal can be traced to the General Agreement on Trade and Tariffs, which facilitates international trade and thus the sort of competitive pressure that led Georgia-Pacific to divest its building-products operations. But if the United States' decision to join the GATT means that a sale is not the "sole" cause of the withdrawal, then §1384 is drained of meaning; nothing ever is a "sole" cause in the sense that it is the only event in the causal chain.

Suppose that Georgia-Pacific had not laid off any workers from 1994 through 1997, and had sold those divisions to BlueLinx in 2004 along with the building-products division. Suppose further than in 2001 one of the truck drivers in the building-products division had transferred to a division not involved in the sale and had retired in 2003. As the Plan understands §1384, it would not be possible to call the sale in 2004 the "sole" cause of Georgia-Pacific's complete withdrawal, because one additional cause was the single worker's retirement

in 2003. But for that person's decision, Georgia-Pacific would have had one worker still in the Plan after the sale. Yet this would be an exceedingly implausible understanding of the role that the word "solely" plays in §1384(a). This example shows the problem of thinking about "cause" as an all-or-none matter. Every event has a chain of causes stretching back to the Big Bang. We treat "cause" in law as serving a function by separating one kind of input from another; the Plan's approach, by contrast, treats all potential causes alike.

Consider another example. Suppose that Georgia-Pacific, instead of closing two divisions in 1994–95 and 1997, had sold each of them to another firm that continued the contributions. The sale in 2004 to BlueLinx then would be the third. The Plan's income and number of covered employees would be the same. Yet none of the sales would qualify under the Plan's reading of §1384(a), because none would be "solely" responsible for Georgia-Pacific's complete withdrawal. Each of the three sales would be responsible in part, and therefore none would be exempt from withdrawal liability. That would produce a windfall to the Plan, the very thing §1384 is supposed to prevent.

Things could get even more complex if the sale to BlueLinx had come first. The building-products division was the largest of the three, and closing it without a sale would have led to liability for a partial withdrawal. As a result of §1384, there would not be withdrawal liability had Georgia-Pacific sold the building-products division to BlueLinx in 1994. But if, a decade later, Georgia-

Pacific then laid off the participating employees of the other two divisions, the sale to BlueLinx in 1994 would play a part in Georgia-Pacific's complete withdrawal in 2004. That would defeat the "solely because . . ." condition in §1384(a) and lead to a retroactive assessment of partial withdrawal liability because of the 1994 sale. The Plan denies that a closure in 2004 could lead to liability for a sale in 1994; but if that's so, why should a closure in 1994 lead to liability for a sale in 2004?

As far as we can determine, this is the first appellate decision that has required interpretation of the phrase "solely because" in §1384. (Almost all of the decisions under §1384 have come from this circuit, perhaps because the Central States Plan has been a uniquely aggressive seeker of withdrawal payments.) We think that the best understanding of this phrase is one that concentrates on the transaction at issue: If the sale had not occurred, everything else had remained the same, and no withdrawal liability would have accrued, then the sale to a buyer that continues the pension contributions does not entail withdrawal liability. That's a working definition of "solely," because it separates the role of the sale from the role of everything else.

We can imagine a proviso to this understanding: If the employer crafts a plan to withdraw by stages, and uses a sale only for the last stage, then all transactions may be consolidated and withdrawal liability assessed for the plan as a whole. Tax law uses this step-transaction doctrine to put a multi-stage plan back together and treat it as one event. See *CIR v. Clark*, 489 U.S. 726,

738 (1989). Opinion Letter 92-1 by the General Counsel of the Pension Benefit Guaranty Corporation, which has extensive duties in dealing with underfunded plans, discusses the possibility of consolidating multiple transactions if an employer uses a series of partial withdrawals plus a terminal sale in an effort to avoid withdrawal liability. The arbitrator considered whether the transactions of 1994–95, 1997, and 2004 should be consolidated under this approach and treated as one withdrawal. The arbitrator gave a negative answer after finding that Georgia-Pacific had not formed a plan to withdraw in stages; instead, the arbitrator concluded, each of the three closures was independent of the others and responded to distinct economic conditions.

Whether Georgia-Pacific had one plan that underlay all three closures is a question of fact, and an arbitrator's decision on factual disputes stands unless "a clear preponderance of the evidence" undermines it. 29 U.S.C. §1401(c). The district court concluded that the arbitrator's finding is adequately supported by the evidence. We agree with that conclusion. And as the arbitrator did not make a legal error, the decision must be enforced.

The Plan contends that the standards in Opinion Letter 92-1 are erroneous. To the extent this reflects the Plan's belief that every withdrawal must have multiple causes, it is the Plan that commits the legal error. Because the arbitrator concluded that Georgia-Pacific did not set out in 1994 to withdraw by stages, we need not decide whether all of the analysis in the PBGC's 1992 letter is sound. It is enough to say that, when a sale transfers an

ongoing business to a new firm that is willing and able to make all pension contributions, and when this sale is not part of a plan to withdraw by stages, §1384 shields the selling employer from withdrawal liability.

AFFIRMED