In the

# United States Court of Appeals
## For the Seventh Circuit

_____

Nos. 24-1739, 24-1740, 24-1741 & 24-1742

CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION
FUND and CHARLES A. WHOBREY,

*Plaintiffs-Appellants,*

*v.*

EVENT MEDIA INC., d/b/a COMPLETE CREWING,

*Defendant-Appellee.*

_____

EVENT MEDIA INC., d/b/a COMPLETE CREWING,

*Plaintiff-Appellee,*

*v.*

CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION
FUND,

*Defendant-Appellant.*

_____

PACK EXPO SERVICES, LLC,

*Plaintiff-Appellee,*

*v.*

CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND,

*Defendant-Appellant.*

_____

CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND and CHARLES A. WHOBREY,

*Plaintiffs-Appellants,*

*v.*

PACK EXPO SERVICES, LLC,

*Defendant-Appellee.*

_____

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
Nos. 1:22-cv-6133, 1:22-cv-6143, 1:22-cv-6471 & 1:22-cv-6553 —
**Edmond E. Chang**, *Judge.*

_____

ARGUED DECEMBER 10, 2024 — DECIDED APRIL 24, 2025

_____

Before KIRSCH, LEE, and KOLAR, *Circuit Judges.*

KIRSCH, *Circuit Judge.* This case presents a narrow question of statutory interpretation concerning multiemployer pension plans. Event Media Inc. and Pack Expo Services, LLC, were contributing employers to the Central States, Southeast and

Southwest Areas Pension Fund. They withdrew from the Fund and incurred withdrawal liability obligations. The employers and Fund disagree over how to calculate those obligations, a dispute that requires us to interpret 29 U.S.C. § 1085(g)(3). In a well-reasoned opinion, the district court held that the employers' post-2014 contribution rate increases should be excluded from the calculation. We affirm.

I

A

Although our interpretive question is narrow, it involves a complex web of pension plan statutes. Congress enacted the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 et seq., "to ensure that employees and their beneficiaries would not be deprived of anticipated retirement benefits by the termination of pension plans before sufficient funds have been accumulated in them." *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 607 (1993) (cleaned up). To that end, ERISA provides that any employer who withdraws from an insolvent pension plan during the five years prior to insolvency is "liable for a fair share of the plan's underfunding." *Milwaukee Brewery Workers' Pension Plan v. Joseph Schlitz Brewing Co.*, 513 U.S. 414, 416 (1995). But this provision had an unintended consequence. It "encouraged an employer to withdraw from a financially shaky plan and risk paying its share if the plan later became insolvent, rather than to remain and (if others withdrew) risk having to bear alone the entire cost of keeping the shaky plan afloat." *Id.* at 416–17. "Consequently, a plan's financial troubles could trigger a stampede for the exit doors, thereby ensuring the plan's demise." *Id.* at 417.

To fix this problem, Congress passed the Multiemployer Pension Plan Amendments Act of 1980, 29 U.S.C. §§ 1381–1461, which requires "employers who withdraw from underfunded multiemployer pension plans to pay withdrawal liability." *Bay Area Laundry & Dry Cleaning Pension Tr. Fund v. Ferbar Corp. of Cal., Inc.*, 522 U.S. 192, 196 (1997) (quotation omitted). An employer's withdrawal liability "roughly matches [its] proportionate share of the plan's unfunded vested benefits." *Id.* (quotation omitted). Withdrawing employers may make their withdrawal liability payments in either one lump sum or periodic installments, *id.* at 195, and installments are calculated using the employer's "highest contribution rate" during the ten years before withdrawal, 29 U.S.C. § 1399(c)(1)(C)(i)(II).

Congress later passed the Pension Protection Act of 2006, which requires underfunded multiemployer pension plans to take certain remedial measures. Pub. L. No. 109–280, 120 Stat. 780. Now, pension plans in "endangered status" must adopt "funding improvement plan[s]," and pension plans in "critical status" or "critical and declining status" must adopt "rehabilitation plan[s]." 29 U.S.C. § 1085(a). Both measures require the pension plan to propose changes—reduce future benefit accruals, increase contributions, or both—that would enable the plan to recover from its underfunded status. *Id.* § 1085(c)(1)(B)(i) & (e)(1)(B).

But the Pension Protection Act's requirements created another unintended consequence. Although Congress intended an employer's withdrawal liability and its share of a pension plan's unfunded vested benefits to rise and fall together (that is, an employer pays more to withdraw if it has more unfunded vested benefits in the plan), see *Bay Area Laundry*, 522

U.S. at 196; *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 725 (1984), the opposite now occurred. An employer's withdrawal liability increased as its share of unfunded vested benefits decreased (that is, it paid more to withdraw despite having fewer unfunded vested benefits in the plan). See Methods for Computing Withdrawal Liability, Multiemployer Pension Reform Act of 2014, 86 Fed. Reg. 1256, 1264 (Jan. 8, 2021). This happened because an employer's periodic withdrawal liability payments are calculated using its highest contribution rate in the past ten years, 29 U.S.C. § 1399(c)(1)(C)(i)(II), and a funding improvement plan or rehabilitation plan often requires employers to increase their contribution rates, see *id.* § 1085(c)(1)(B)(i) & (e)(1)(B). Thus, as an employer's contribution rate increased to reduce unfunded vested benefits, the penalty for withdrawing also increased.

To address this issue, Congress adopted the Multiemployer Pension Reform Act of 2014, which excludes certain post-2014 increases in an employer's contribution rate from the calculation of its periodic withdrawal liability payments. Pub. L. No. 113-235, Div. O, § 109, 128 Stat. 2130, 2789–92 (codified at 26 U.S.C. § 432, 29 U.S.C. § 1085); see also Methods for Computing Withdrawal Liability, 86 Fed. Reg. at 1264. Specifically, § 1085(g)(3) outlines the "[c]ontribution increases required by funding improvement or rehabilitation plan[s]" that are disregarded in withdrawal liability determinations:

> (A) In general
>
> Any increase in the contribution rate … that is required or made in order to enable the plan to meet the requirement of the funding improvement plan or rehabilitation plan shall be

> disregarded in determining … the highest con-
> tribution rate ….

*Id.* § 1085(g)(3)(A). And any increase in the contribution rate
is deemed required to meet the funding improvement or re-
habilitation plan with two exceptions:

> (B) Special rules
>
> For purposes of this paragraph, any increase in
> the contribution rate … shall be deemed to be
> required or made in order to enable the plan to
> meet the requirement of the funding improve-
> ment plan or rehabilitation plan except for [1]
> increases in contribution requirements due to
> increased levels of work, employment, or peri-
> ods for which compensation is provided or [2]
> additional contributions are used to provide an
> increase in benefits, including an increase in fu-
> ture benefit accruals, permitted by subsection
> (d)(1)(B) or (f)(1)(B).

*Id.* § 1085(g)(3)(B). This appeal concerns the second exception
and the meaning of "permitted by subsection … (f)(1)(B)."

B

Event Media Inc. and Pack Expo Services, LLC, (collec-
tively, the Employers) were contributing employers to the
Central States, Southeast and Southwest Areas Pension Fund.
In 2008, the Fund's actuary certified that the Fund was in crit-
ical status, which required it to adopt a rehabilitation plan.
See 29 U.S.C. § 1085(a)(2) & (b)(2). When the Fund's actuary
certified in 2019 that the Fund was in critical and declining
status and projected it would become insolvent by 2025, the

Employers withdrew from the Fund and incurred withdrawal liability obligations.

The parties dispute how much the Employers must pay in periodic installments. In 2014, each Employer's contribution rate was $328, and it increased every year until reaching $424 in 2019, the year the Employers withdrew from the Fund. When calculating the Employers' withdrawal liability payments, the Fund used the higher 2019 rate because that was the "highest contribution rate" in the past ten years. See *id.* § 1399(c)(1)(C)(i)(II). The Employers argue the Fund should have used the lower 2014 rate because § 1085(g)(3) excludes from the calculation all post-2014 contribution rate increases that are required by a rehabilitation plan. This dispute presents a question of first impression for the courts of appeals. We conclude that the Fund should have used the 2014 rate.

II

Despite ERISA's labyrinthian structure, this exercise in statutory interpretation is straightforward. When determining the highest contribution rate a pension plan should use to calculate an employer's periodic withdrawal liability payments, § 1085(g)(3)(A) disregards any post-2014 contribution rate increase that is required to meet a funding improvement plan or rehabilitation plan. And all contribution rate increases are deemed "required" unless either of two exceptions applies. 29 U.S.C. § 1085(g)(3)(B). Neither does in this case, so the Employers' post-2014 contribution rate increases are disregarded from their withdrawal liability payment calculations.

The first exception is "for increases in contribution requirements due to increased levels of work, employment, or

periods for which compensation is provided." *Id.* The parties agree this exception doesn't apply. The second is for "additional contributions … used to provide an increase in benefits, including an increase in future benefit accruals, permitted by subsection (d)(1)(B) or (f)(1)(B)." *Id.* The parties likewise agree that § 1085(d)(1)(B) doesn't apply (nor could it, because it's for funding improvement plans, and the Fund adopted a rehabilitation plan). The Fund instead focuses on § 1085(f)(1)(b) and argues that the post-2014 contribution rate increases were used to provide an increase in benefits permitted by § 1085(f)(1)(B). We disagree.

Section 1085(f)(1)(B) permits amendments to a pension plan that increase benefits, but only where "the plan actuary certifies that such increase is paid for out of additional contributions not contemplated by the rehabilitation plan." The parties agree there was no amendment, and the Fund points us to no actuarial certification, so § 1085(f)(1)(B) doesn't apply either. Because the post-2014 contribution rate increases were not "permitted by subsection … (f)(1)(B)," the Fund must disregard them in calculating the Employers' withdrawal liability payments. 29 U.S.C. § 1085(g)(3)(B).

The Fund contends that "permitted by subsection … (f)(1)(B)" really means not prohibited by subsection (f)(1)(B). Because § 1085(f)(1)(B) only deals with amendments to a pension plan made after the adoption of a rehabilitation plan, the Fund believes that increases in the contribution rate predating the rehabilitation plan do not require a plan amendment and are thus not prohibited by § 1085(f)(1)(B). The Fund says this includes the contribution rate increases at issue here because they were included in the Fund's pension plan documents that predate the rehabilitation plan. But the Fund's argument

does not convince us. If Congress meant not prohibited, it could have used those words. And although the Fund argues permitted can be construed passively to mean not prohibited, see *Legal Maxims*, Black's Law Dictionary (12th ed. 2024) ("Everything that the law does not forbid is permitted."), we believe the better construction of the statutory language requires more affirmative permission. What § 1085(f)(1)(B) affirmatively permits is post-rehabilitation plan amendments to the pension plan, accompanied by actuarial certification. Because the post-2014 contribution rate increases were not included as an amendment to the rehabilitation plan and were not accompanied by actuarial certification, they were not "permitted by subsection … (f)(1)(B)."

More broadly, the Fund construes § 1085(g)(3) to include—not disregard—all contribution rate increases in withdrawal liability payment calculations unless those increases reduce unfunded vested benefits or were made via an amendment but unaccompanied by an actuarial certification. It argues that § 1085(g)(3)(B) simply lays out some examples of contribution rate increases to be included in calculating an employer's withdrawal liability, rather than establishing the only exceptions to the general prohibition against including contribution rate increases. The Fund justifies this interpretation by arguing § 1085(g)(3) has a specific and limited purpose: to avoid an undesirable outcome where an employer reduces a pension plan's unfunded vested benefits—thereby improving the health of the pension plan and furthering the rehabilitation plan's requirements—but at the same time counterproductively increases its withdrawal liability.

But the Fund ignores the language of the statute. Section 1085(g)(3) excludes contribution rate increases "[i]n general,"

unless some limited, "[s]pecial" exception applies. It provides that any contribution rate increase required to meet the rehabilitation plan shall be disregarded in calculating the highest contribution rate, *id.* § 1085(g)(3)(A), and it deems all contribution rate increases to be required to meet the rehabilitation plan unless, as relevant here, the rate increase is permitted by § 1085(f)(1)(B), *id.* § 1085(g)(3)(B). The Fund makes a reasonable argument about § 1085(g)(3)'s purpose, but ERISA is "an enormously complex and detailed statute that resolved innumerable disputes between powerful competing interests." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993). Balancing those competing interests is Congress's job, which it has repeatedly performed by revising the statutory scheme for multiemployer pension plans. Our job is to interpret the text Congress provides. We decline the Fund's invitation to stray beyond that text and balance the interests ourselves.

AFFIRMED