In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

No. 24-2486

SUPERVALU, INC.,

*Plaintiff-Appellant*,

*v.*

UNITED FOOD AND COMMERCIAL WORKERS UNIONS AND EMPLOYERS MIDWEST PENSION FUND,

*Defendant-Appellee*.

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:21-cv-05625 — **Martha M. Pacold**, *Judge*.

———————————

ARGUED APRIL 3, 2025 — DECIDED OCTOBER 9, 2025

———————————

Before BRENNAN, *Chief Judge*, and HAMILTON and SCUDDER, *Circuit Judges*.

BRENNAN, *Chief Judge*. A multiemployer pension plan is created by a collective bargaining agreement among two or more employers and a union. When a company withdraws from such a plan, federal law requires the company to pay its fair share of what it would have owed to protect the plan's solvency. That payment can be made in annual installments.

The question here is how to calculate those installments when the company previously sold a piece of its business.

## I

## A

In a multiemployer pension plan, an employee may move between participating employers without losing service credit for pension benefits. *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 605–06 (1993). As a result, these plans are common in industries with high turnover or where work is seasonal or short-term, such as construction and trucking. *Chi. Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. CPC Logistics, Inc.*, 698 F.3d 346, 347 (7th Cir. 2012). The companies in the plan contribute funds that are "pooled in a general fund available to pay any benefit obligation of the plan." *Concrete Pipe*, 508 U.S. at 605. The companies benefit, too, by having "access to a trained labor force whose members are able to move from one employer and one job to another without losing service credit toward pension benefits." *Id.* at 606–07.

When a company withdraws, the plan remains financially liable to the employees with vested pension rights. Yet the plan "no longer can look to the employer to contribute additional funds to cover these obligations." *Chi. Truck Drivers*, 698 F.3d at 347. Those extra costs are shifted to the employers remaining in the plan. So, as more companies withdraw, those still participating have higher costs. As costs rise, more companies could withdraw to avoid paying. One company's departure therefore can lead to a "stampede for the exit doors, thereby ensuring the plan's demise." *Milwaukee Brewery*

*Workers' Pension Plan v. Joseph Schlitz Brewing Co.*, 513 U.S. 414, 417 (1995).

Congress set out to fix this issue, which required weighing competing interests. It wanted to discourage employers from exiting multiemployer pension plans to halt these downward spirals. *Banner Indus., Inc. v. Cent. States, Se. & Sw. Areas Pension Fund*, 875 F.2d 1285, 1290 (7th Cir. 1989). But if the penalty for withdrawing were too punitive, companies would not join plans in the first place. Congress struck a balance by adding provisions to the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq., in the Multiemployer Pension Plan Amendments Act of 1980, 29 U.S.C. §§ 1381–1461 ("MPPAA"). Withdrawing companies now pay a charge.

That charge, called "withdrawal liability," reflects the employer's fair share of the plan's underfunding (also known as unfunded vested benefits). *Milwaukee Brewery*, 513 U.S. at 417; *Concrete Pipe*, 508 U.S. at 610. That fair share is calculated "based primarily upon the comparative number of that employer's covered workers in each earlier year and the related level of that employer's contributions." *Milwaukee Brewery*, 513 U.S. at 417. A section of the MPPAA provides several different complex, carefully crafted methods for calculating a company's withdrawal liability. 29 U.S.C. § 1391 (ERISA § 4211)).[1] We term this section "withdrawal-liability § 4211."

A second section, 29 U.S.C. § 1384 (ERISA § 4204, what we call "safe-harbor § 4204"), addresses asset sales. As an example, Company A participates in a multiemployer pension plan

---

[1] "Withdrawal liability" can mean the amount a company owes in total or what it owes each month. *Compare* 29 U.S.C. § 1391, *with* § 1399. Our use of "withdrawal liability" refers to the former.

and is sold to Company B. Company A need not pay with-drawal liability if Company B, as part of the sale, agrees, among other obligations, "to make contributions to the plan at substantially the same level" as Company A's previous contributions. *CenTra, Inc. v. Cent. States, Se. & Sw. Areas Pension Fund*, 578 F.3d 592, 599 (7th Cir. 2009); 29 U.S.C. § 1384(a). But Company A is not off the hook; it remains "secondarily liable for the first five years of the buyer's payments." *Cent. States v. Ga.-Pac. LLC*, 639 F.3d 757, 759 (7th Cir. 2011).

As this court has recognized, safe-harbor § 4204 "avoids windfalls to pension plans." *Id.* When a company in a mul-tiemployer plan is sold, if the plan does not "lose contribu-tions because of the sale," the withdrawing company should not have to pay withdrawal liability. *Id.*

A third section, 29 U.S.C. § 1399 (ERISA § 4219, what we call "payment-schedule § 4219"), delineates how a company may pay its withdrawal liability. A company need not pay what it owes in one lump sum—it can make payments in an-nual installments. *Milwaukee Brewery*, 513 U.S. at 418; *Cent. States, Se. & Sw. Areas Pension Fund v. Event Media Inc.*, 135 F.4th 529, 531 (7th Cir. 2025). The equation for calculating these annual installments is found in 29 U.S.C. § 1399(c)(1)(C)(i).

The equation multiplies two numbers. The first is the "av-erage annual number of contribution base units for the period of 3 consecutive plan years … during the period of 10 consec-utive plan years … in which the number of contribution base units … is the highest." *Id.* at (I) (called here the "operative provision"). Begin with "contribution base units," which measure employee work, such as in weeks. *See, e.g., Cent. States, Se. & Sw. Areas Pension Fund v. Robinson Cartage Co.*, 55

F.3d 1318, 1321 (7th Cir. 1995) (defining contribution base units as "the total number of weeks worked by the eligible employees"). Next, ten consecutive years "ending before the plan year in which the withdrawal occurs" is the time period. 29 U.S.C. § 1399(c)(1)(C)(i)(I). So, a plan calculates the highest annual three-year average of contribution base units over those ten years. That average becomes the first number.

To illustrate, suppose in the last 10 years, a company had a single pension-eligible employee in odd years and two pension-eligible employees in even years. The contribution base unit is tied to weeks, and every employee averages 52 weeks of work per year. In odd years, when one employee works, the company's contribution base units for that one pension-eligible employee would be 52 (1 × 52). In even years, when two employees work, the company's contribution base units would be 104 (2 × 52). So, looking back 10 years, the highest average annual contribution base unit over "3 consecutive plan years," would be 86.7. That figure is the sum of 104 for year two, 52 for year three, 104 for year four, divided by three: 86.7.

The second number in the equation is the "highest contribution rate" for any one year over those ten years. *Id.* § 1399(c)(1)(C)(i)(II). The contribution rate is the dollar amount that a company contributes for every contribution base unit. *See, e.g.*, *Bd. of Trs. of IBT Loc. 863 Pension Fund v. C & S Wholesale Grocers, Inc.*, 802 F.3d 534, 539 (3d Cir. 2015) ("$4.06 per hour"). Recall the illustration above. Suppose that for every week of work, the company contributes $1.00 for odd years and $3.00 for even years. The "highest contribution rate" over those 10 years is $3.00.

Taken together, the schedule for how a withdrawing company pays its withdrawal liability is the product of the first number—the highest three-consecutive-year annual average of contribution base units—and the second number—the highest contribution rate. From the example above, it would be 86.7 multiplied by $3.00, which equals $260.10. So, each year, the company pays $260.10 in annual installments.

But a company need not pay these annual installments forever. Payment-schedule § 4219 limits the number of years of repayment, generally setting a 20-year cap. 29 U.S.C. § 1399(c)(1)(B). Any amount remaining after 20 years does not need to be paid. *Milwaukee Brewery*, 513 U.S. at 419 (The statute "forgives all debt outstanding after 20 years.").

**B**

With these statutes in mind, we consider the undisputed facts. The Union Food and Commercial Workers Unions and Employers Midwest Pension Fund is a multiemployer pension plan. SuperValu, Inc., contributed to the Fund for over ten years on behalf of employees covered under related collective bargaining agreements.

In September 2018 SuperValu, a supermarket chain, sold some of its stores to Schnuck's Markets, Inc. Five of the sold stores employed workers covered by the Fund ("the Sold Stores"). That sale qualified under safe-harbor § 4204. Thus, SuperValu did not incur withdrawal liability, even though it no longer contributed to the Fund for the employees at these Sold Stores. Months later SuperValu closed its remaining stores, completely withdrawing from the Fund. This triggered withdrawal liability.

The Fund calculated SuperValu's liability using the equation in withdrawal-liability § 4211. To begin, SuperValu owed an estimated $96.2 million. The Fund then believed the contribution base unit history of the Sold Stores, which amounted to $53.5 million, should be deducted from that total, leaving $42.7 million.

Next, the Fund calculated SuperValu's annual installments under payment-schedule § 4219. The Fund started with the operative provision, identifying the highest annual three-consecutive-year average of contribution base units over the past ten years. That number was 734,429, the average of years 2008–2010. The Fund evaluated how the sale of the Sold Stores changed that number, as it did with the withdrawal liability calculation.

To compensate for the Sold Stores, the Fund deducted their contribution base units. It looked to 29 U.S.C. § 1384(b)(1) and deducted the Sold Stores' units for only the year they were sold and the preceding four years. The Fund included the Sold Stores' units for the first five years of the 10-year lookback period. As a result, when the Fund calculated the highest three-year consecutive annual average, it picked from the first five years, as those included the Sold Stores' contribution history. After applying the 20-year cap, SuperValu owed tens of millions less than it originally did. The final figure was $22.6 million.

The Fund's decision not to deduct the Sold Stores' units for the entire ten years is at the heart of this case. SuperValu contends the Fund should have deducted the Sold Stores' units throughout the ten years, not just the most recent five years. The Fund counters that the plain language of payment-

schedule § 4219 and safe-harbor § 4204 does not mandate that the deduction should apply over all ten years.

Because SuperValu disagreed with the Fund's payment-schedule calculation, it requested arbitration under 29 U.S.C. § 1401(a)(1). The arbitrator sided with the Fund, as did the district court. The district court, "[f]ollow[ing] the text of the statute," concluded that the Fund was not compelled by the text to deduct the Sold Stores' units for all ten years. That was because "there's just no restriction … on what [contribution base units] can be considered." Indeed, the text "doesn't say anything one way or another about how or which [contribution base units] should be considered." SuperValu's arguments based on authorities and the purpose of the statutory provisions did not persuade the district court otherwise: "[I]t's really an argument on the basis of legislative history and purpose and inference," which "extends the text of the [safe-harbor section] beyond what it directly says." SuperValu appeals.

## II

When an arbitrator decides a question of law in an MPPAA case, our review is de novo. *Artistic Carton Co. v. Paper Indus. Union—Mgmt. Pension Fund*, 971 F.2d 1346, 1348 (7th Cir. 1992). This court also reviews a district court's legal conclusions de novo. *Wirth v. RLJ Dental, S.C.*, 59 F.4th 270, 272 (7th Cir. 2023). The parties submitted cross-motions for summary judgment, and the district court granted the Fund's motion. A grant of summary judgment is reviewed de novo. *Kinder v. Marion Cnty. Prosecutor's Off.*, 132 F.4th 1005, 1008 (7th Cir. 2025).

We start where the district court did: the text of the operative provision found in payment-schedule § 4219. 29 U.S.C. § 1399(c)(1)(C)(i)(I). SuperValu asks us to read this provision as implicitly requiring a fund to deduct contribution units for asset sales qualifying under safe-harbor § 4204 for the full ten-year lookback period.

But the operative provision's text does not refer to safe-harbor § 4204. "It is a fundamental principle of statutory interpretation that 'absent provision[s] cannot be supplied by the courts.'" *Rotkiske v. Klemm*, 589 U.S. 8, 14 (2019) (quoting ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 94 (2012)). This includes hole-punching exceptions into a statutory calculation. "[W]hen Congress chooses not to include any exceptions to a broad rule, courts apply the broad rule." *Bostock v. Clayton County*, 590 U.S. 644, 669 (2020).

Congress in the MPPAA enacted an intricate statutory scheme with detailed calculations, all of which came about through the legislative process: a balance of competing interests, legislative compromise, and stakeholder input. Courts "must respect the formula that Congress prescribed." *Advoc. Christ Med. Ctr. v. Kennedy*, 605 U.S. 1, 20 (2025). We especially avoid adding text "[i]n light of Congress' special care in drawing so precise a statutory scheme." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 356 (2013).

We have often recognized this principle when interpreting ERISA. In *Bauwens v. Revcon Technology Group, Inc.*, at issue was a clause in the MPPAA that allowed plans to accelerate the outstanding withdrawal liability if an employer defaults. 935 F.3d 534, 537 (7th Cir. 2019). But we declined to add a right to decelerate, as the text was silent on the question. *Id.* at 539.

*Bauwens* reaffirmed that "because ERISA is a highly technical statute, our part is to apply it as precisely as we can, rather than to make adjustments according to a sense of equities in a particular case." *Id.* at 538 (quoting *Johnson v. Ga.-Pac. Corp.*, 19 F.3d 1184, 1190 (7th Cir. 1994)) (citation modified).

In *Bell Transit*, too, we refused to add text to the requirements listed in safe-harbor § 4204. *Cent. States, Se. & Sw. Areas Pension Fund v. Bell Transit Co.*, 22 F.3d 706, 712 (7th Cir. 1994). "For us to add such a remedy … would clearly upset the balance of remedies struck by Congress between the seller and the plan." *Id.* In a different case, this court refused to interpret "all" in ERISA as "virtually all" or "substantially all." *Trs. of Iron Workers Local 473 Pension Tr. v. Allied Prods. Corp.*, 872 F.2d 208, 213 (7th Cir. 1989).

What is more, Congress likely intended the operative provision not to refer to safe-harbor § 4204. Consider that payment-schedule § 4219 references several other provisions. *See* 29 U.S.C. § 1399(a)–(d). That section also includes several exceptions. *Id.* § 1399(c)(1)(A)(i), (C)(i); (c)(6) (all using "Except"). If Congress wanted to craft an exception in the operative provision or reference the safe-harbor § 4204, it knew how to do so. "Atextual judicial supplementation is particularly inappropriate when, as here, Congress has shown that it knows how to adopt the omitted language or provision." *Rotkiske*, 589 U.S. at 14; *see also Bauwens*, 935 F.3d at 539 (same).

Further, the operative provision uses the term "highest" contribution base units. Words that lack qualifications, like "highest," "all," "none," or "lowest," express the ends of the spectrum. Their meanings do not admit of exceptions. In *Allied Products*, this court concluded that by using the term "all" in ERISA, Congress "meant 100 percent" because it "opted for

the unqualified 'all.'" 872 F.2d at 213. "All" did not mean "virtually all" or "substantially all." *Id.* So, Congress meant what it said with "the highest." *See also FDA v. R.J. Reynolds Vapor Co.*, 145 S. Ct. 1984, 1994 (2025) (making similar point about "any" in a statute). Consider also the accompanying definite article "the" in "the highest," which shows that Congress meant *the* highest. The Third Circuit acknowledged this when interpreting another ERISA provision that used the phrase "the highest." *C & S Wholesale Grocers*, 802 F.3d at 542. "There is no ambiguity in the definite article 'the.'" *Id.* Congress thus "designated 'the highest' rate as the appropriate rate to apply." *Id*. For that reason, when Congress says, "the highest," it means simply the highest annual three-consecutive-year average over the past ten years, not the highest after excluding those units from asset sales.

To counter these textual arguments, SuperValu points out that the Fund did deduct some of the Sold Stores' contribution units. It is true that the Fund, relying on safe-harbor § 4204, excluded the Sold Stores' contribution units for the most recent five years. The Fund's interpretation is therefore incorrect, SuperValu argues, because the text of safe-harbor § 4204 does not mention excluding only the most recent five years. To SuperValu, if nothing limits the deduction to just five years, the Fund should deduct over the entire ten-year period. This also goes to a more general point SuperValu offers. It insists the Fund "contradicted itself" by excluding the Sold Stores from the withdrawal liability calculation but not entirely from the payment schedule calculation.

SuperValu's counterarguments do not succeed for two reasons. First, while parties argue for their respective interpretations, courts interpret statutes. The Fund's actions are

not relevant to the meaning of the statutory text. "The final interpretation of the law is the proper and peculiar province of the courts." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 385 (2024) (quoting THE FEDERALIST NO. 78, at 525 (J. Cooke ed. 1961) (A. Hamilton) (citation modified)). A fellow circuit court interpreting ERISA also recognized this: "What is here involved is a matter of statutory interpretation, and therefore we are not required to give a deferential view to the Fund's statutory construction, a matter properly for the courts to decide." *Teamsters Pension Tr. Fund of Phila. & Vicinity v. Cent. Mich. Trucking, Inc.*, 857 F.2d 1107, 1111–12 (6th Cir. 1988).

Second, the Fund incorrectly relied on safe-harbor § 4204 for its decision to deduct the Sold Stores' contribution units for just some of the preceding ten years. The Fund pointed to 29 U.S.C. § 1384(b)(1) as support for its decision. But that provision speaks to a purchaser's liability. The purchaser of the Sold Stores here is Schnuck's, not SuperValu. Regardless, the text of payment-schedule § 4219 does not require the Fund to deduct at all.

In short, our interpretation stays true to the text of the operative provision. And rather than supplement the statute with text, we "respect the formula that Congress prescribed." *Advoc. Christ Med. Ctr.*, 605 U.S. at 20.

### III

### A

Next we consider SuperValu's elaborate reading of the various statutory sections, which we view as a two-step interpretation of payment-schedule § 4219.

SuperValu does not start with the operative provision in payment-schedule § 4219. Instead, it first points to the

relationship between withdrawal-liability § 4211 and safe-harbor § 4204. SuperValu argues that the purpose of the safe harbor is to prevent "double recovery." Therefore, the withdrawal liability calculation must account for that purpose, even though the text does not refer to the safe harbor.

Second, SuperValu homes in on similar language in withdrawal-liability § 4211 and payment-schedule § 4219. It contends that these provisions should be interpreted similarly: Just as the withdrawal-liability § 4211 accounts for asset sales under safe-harbor § 4204, the payment-schedule § 4219 should, too. As a result, SuperValu argues that the Sold Stores' contribution units should be deducted in the calculation found in payment-schedule § 4219.

### 1. *The withdrawal-liability and safe-harbor sections*

Start with the first step. A company's withdrawal liability—here, what SuperValu owes the Fund—is calculated under the methods set forth in withdrawal-liability § 4211. Remember, too, that under safe-harbor § 4204, a selling company need not pay withdrawal liability for sold assets.

SuperValu argues the calculation under withdrawal-liability § 4211 deducts the contribution base unit history from sales covered by safe-harbor § 4204. It relies on three authorities. Its first and principal source is *Borden, Inc. v. Bakery & Confectionery Union & Industry International Pension*, 974 F.2d 528 (4th Cir. 1992). There, Borden and its subsidiaries were parties to collective bargaining agreements requiring contributions to a fund for certain employees. *Id.* at 531. Borden sold the assets of one of its subsidiaries, Drake Bakeries, to Continental Baking Company. *Id.* That sale did not trigger withdrawal liability because Continental assumed Borden's

obligation to contribute to the Fund on behalf of Drake's employees. *Id.* But when Borden then closed two more subsidiaries, it incurred partial withdrawal liability. *Id.* The "narrow question" in *Borden* was how to account for the asset sale of Drake in the withdrawal liability calculation. *Id.* at 528, 532 ("For the purposes of calculating withdrawal liability, to whom, if anyone, does the MPPAA assign that portion of the withdrawal liability which is based on the pre-five-year contribution history of a subsidiary sold under § 1384?").

The court in *Borden* interpreted safe-harbor § 4204 "to preclude consideration of Drake's … contribution history for the purpose of calculating any employer's withdrawal liability." *Id.* at 535. Said otherwise, "no part of the contribution history … attributable to assets previously sold in accordance with [safe-harbor § 4204] is to be considered for the purpose of calculating a seller's subsequent withdrawal liability." *Id.* at 536.

*Borden* did not, however, start with the text of withdrawal-liability § 4211. Indeed, it acknowledged that text led to the opposite of its holding. *Id.* at 533. Instead, the court expressed concern that a plain text interpretation could lead to funds double recovering. *Id.* "[T]his reconciliation of [safe-harbor § 4204] and [withdrawal-liability § 4211] … avoids the potential of double recovery by the plan and enables the scheme chosen by Congress for the purpose of determining withdrawal liability to work as intended." *Id.* at 535–36. The court in *Borden* concluded that although withdrawal-liability § 4211 does not reference safe-harbor § 4204, when calculating withdrawal liability, the contribution units for past covered asset sales must still be deducted. *Id.* at 536.

Second, SuperValu relies on *CenTra, Inc. v. Central States, Southeast & Southwest Areas Pension Fund*, 578 F.3d 592 (7th

Cir. 2009). That case involved several steps in a corporate re-organization, one of which did not qualify as an asset sale under safe-harbor § 4204. *Id.* at 603–04. But in *CenTra* this court discussed what would happen if that one step had qualified. The company could "avoid having those contributions used in the calculation of the parent's withdrawal liability." *Id.* at 604. Thus, this court recognized that the calculation of with-drawal-liability may deduct qualifying transactions under the safe-harbor § 4204.

Third, SuperValu cites an opinion letter from the Pension Benefit Guaranty Corporation, a federal agency ERISA created to protect pension benefits in single-employer and mul-tiemployer private sector plans. Pension Benefit Guar. Corp., Opinion Letter 83-10 (May 12, 1983). The letter concludes that "the calculations … for computing withdrawal liability should reflect the fact that there is a transfer of contribution history pursuant to § 4204[]." *Id.* As in *Borden*, concerns about "double recovery" motivated this conclusion. *Id.*

SuperValu argues these three authorities support the idea that in the calculation under withdrawal-liability § 4211, con-tribution units from previous qualifying sales under safe-harbor § 4204 are deducted. For a textual hook, SuperValu points to the use of the term "employer" in withdrawal-liability § 4211. *See* 29 U.S.C. § 1391(b)(2)(E)(ii)(I), (b)(3)(B)(i), (c)(2)(B)(ii)(I). As SuperValu sees it, "employer" should be viewed at the time of withdrawal. At that time, the "em-ployer," SuperValu, did not have "contributions required to be made" for the Sold Stores because they had been sold to Schnuck's. *Cf. Cent. States Se. & Sw. Areas Pension Fund v. Mes-sina Prods., LLC*, 706 F.3d 874, 877 n.2 (7th Cir. 2013) ("[T]he

arbitrator must decide whether [the withdrawing employers] were in the control group at the time of withdrawal.").

   2. *The withdrawal-liability and payment-schedule sections*

As a second step, SuperValu points to language in payment-schedule § 4219. Remember, to calculate the annual payment, the first number in the equation is "the average annual number of contribution base units for the period of 3 consecutive plan years … in which the number of contribution base units *for which the employer had an obligation to contribute* under the plan is the highest." 29 U.S.C. § 1399(c)(1)(C)(i)(I) (emphasis added). The italicized phrase, SuperValu submits, is "materially identical" to the phrase "contributions required to be made by the employer" in withdrawal-liability § 4211. And, as stated above, for SuperValu, "employer" in payment-schedule § 4211 means the company at the time of withdrawal. Because both payment-schedule § 4219 and withdrawal-liability § 4211 use "employer," the presumption of consistent usage would suggest the term means the same thing in both sections. *See, e.g.*, *Env't Def. v. Duke Energy Corp.*, 549 U.S. 561, 574 (2007) ("[W]e presume that the same term has the same meaning when it occurs here and there … in a single statute.").

When SuperValu withdrew, it did not own the five stores sold to Schnuck's. It was Schnuck's responsibility to contribute on behalf of those stores. To reflect that, SuperValu submits its withdrawal liability and annual payment should be reduced accordingly.

### B

SuperValu's interpretation falters for three reasons. First, the authorities it cites do not support its interpretation.

Second, under our reading of these statutes, a fund would not receive a "double recovery" nor does that concern drive our decision. Third, SuperValu's use of the presumption of consistent usage canon is rebutted by the text and statutory structure. SuperValu's elaborate reading of payment-schedule § 4219 creates ambiguity where there is none.

   1. *Authorities cited by SuperValu*

All agree that SuperValu's three authorities address the interplay between withdrawal-liability § 4211 and safe-harbor § 4204. Its three sources contain broad language and discuss principles relevant here. But they do not support a reading that payment-schedule § 4219 should exclude the contribution histories of stores previously sold under a safe-harbor § 4204 asset sale.

Start with *Borden*, which rejected a literal interpretation of withdrawal-liability § 4211. 974 F.2d at 533. Instead, there the Fourth Circuit "synthesize[d]" withdrawal-liability § 4211 and safe-harbor § 4204. That case crafted a rule that an asset sale "satisfying the conditions of [safe-harbor § 4204] effects a transfer of the subsidiary's contribution history to the purchaser and removes it from further consideration in the computation of the seller's withdrawal liability." *Id.* at 529. *Borden* also disclaimed extending its reasoning outside withdrawal-liability § 4211, limiting itself to resolving only a "narrow question" of the overlap between the two provisions. *Id.* at 528.

*Borden* also answered a second question of whether the Fund could assess interest during a "gap year." *Id.* at 536. The text of payment-schedule § 4219 did not resolve that question. *Id.* For the court in *Borden*, "this silence is telling. When a

statute prescribes amounts and computations with as much detail and thoroughness as is the case with ERISA … that omission was deliberate." *Id.* Thus, the only passage in *Borden* discussing payment-schedule § 4219 stated that silence in ERISA's detailed and thorough "computations" is intentional. *See id.* SuperValu contends that payment-schedule § 4219 implicitly refers to safe-harbor § 4204. Yet, as just noted, *Borden* rejects such an implication from silence.

For other reasons, the reading of these statutes in *Borden* does not bind us here. *CenTra* stated an employer "*can* shed its … contribution histories … by engaging in [a safe-harbor] transaction." 578 F.3d at 604. That speaks in similar terms as *Borden*. This discussion in *CenTra* is dicta, though, as this court was speaking hypothetically: CenTra had not engaged in the "necessary transaction" to receive safe-harbor protection. *Id*.

In addition, the court in *Borden* stated, "it is generally accepted that Congress did not intend" withdrawal-liability § 4211 and safe-harbor § 4204 "working together, to result in a potential double recovery by the Fund." 974 F.2d at 533. To support that premise, *Borden* looked to a footnote in *Morrison-Knudsen Construction Co. v. Director, Office of Workers' Compensation Programs*, 461 U.S. 624, 637 n.14 (1983), which interpreted the Longshoremen's and Harbor Workers' Compensation Act. *See Borden*, 974 F.2d at 533. That footnote provides a detailed explanation for why Congress did not intend parties to "double recover" under that Act. *Morrison-Knudsen*, 461 U.S. at 637 n.14. That is dubious support for "generally accept[ing]" that ERISA also forbids "double recovery."

SuperValu's other two authorities also do not persuade. The discussions by this court in *CenTra* and the PBGC in its opinion letter apply to withdrawal-liability § 4211, not to

payment-schedule § 4219. 578 F.3d at 598–604; Pension Benefit Guar. Corp., Opinion Letter 83-10 (May 12, 1983).[2] Given ERISA's careful and complicated construction, courts should be reticent to extend authorities outside the confines of their holdings and analyses. So, like *Borden*, we decline to extend *CenTra* and the PBGC's opinion letter to this case.

SuperValu's authorities interpret withdrawal-liability § 4211 and safe-harbor § 4204. But they did not consider the calculation of the annual payment under § 4219 and assets previously sold under safe-harbor § 4204.

### 2. *"Double recovery"*

SuperValu submits that focusing on only the plain text of payment-schedule § 4219 will result in an increase to the Fund's annual funding level. That result, per SuperValu, conflicts with the purpose of safe-harbor § 4204, identified in *Borden* as preventing "double recovery." 974 F.2d at 533, 536. So, SuperValu submits, we should hold that the operative provision's calculation accounts for asset sales under safe-harbor § 4204. But that interpretation suffers from three problems.

*First*, it is unclear how a calculation in the text of payment-schedule § 4219 results in the Fund recovering anything additional. That is because payment-schedule § 4219 "sets forth rules for calculating a withdrawing employer's fair share of a plan's underfunding." *Milwaukee Brewery*, 513 U.S. at 417–18 (describing the payment-schedule section as determining how "the employer pay[s] the withdrawal charge"). Our interpretation does not change the dollar amount SuperValu

---

[2] The opinion letter is not binding but "entitled to respect to the extent it has the power to persuade." *CenTra*, 578 F.3d at 601 (citation modified).

owed—that calculation occurs within withdrawal-liability § 4211, not payment-schedule § 4219. Said another way, changing the schedule for how SuperValu pays its withdrawal liability does not alter the total amount of that liability.

To see why, consider an example SuperValu offers that explains how a "double recovery" may occur under the rule of *Borden*. Suppose Company A sells half its stores to Company B. Company A later withdraws from a fund and must pay a withdrawal liability. If the contribution units from the sale of those sold stores are not deducted in the withdrawal liability calculation, the sold stores' contribution units will increase the withdrawal liability. Next, suppose Company B withdraws, too. It will also pay a withdrawal liability that includes the sold stores' contribution units. In that circumstance, the sold stores' contribution units are included twice: in the withdrawal liability of both Company A and Company B. But had Company A just withdrawn from the fund without selling its stores, the sold stores' units would be counted just once—in its own withdrawal liability. By contrast, our interpretation does not lead to a "double recovery," as the contribution units will not be counted in two streams of payments, thereby increasing what a Fund would receive.

*Second*, even if a "double recovery" could occur from a plain reading of payment-schedule § 4219, Congress likely knew that when it enacted these statutes. In drafting the MPPAA, Congress needed to set forth how a withdrawing company would pay its withdrawal liability. Its choice was between a rule or a standard. If a standard was chosen, the enacted language could look something like "a withdrawing company shall pay its withdrawal liability at a reasonable rate." The standard—"reasonable rate"—encompasses and

thus prevents a host of potential problems, like a payment schedule that allows a fund to "double recover."

But Congress instead prescribed a rule—the calculation found in the operative provision. Calculations, like rules, "are easy to administer but are inevitably both too narrow in some situations … and overbroad in others." *Jaskolski v. Daniels*, 427 F.3d 456, 461 (7th Cir. 2005). In other words, calculations have as a benefit lower administrative costs and fair notice to companies and funds. The downside, however, is an inflexible equation that fails to account for fairness in its calculation (unlike a term such as "reasonable"). That was Congress's legislative choice. *Id.* That a calculation might result in a "double recovery" is "nothing but the rough cuts inevitable with decision" by rule. *Id.* at 462. We need not add a fairness consideration to what is, in effect, a math equation.

*Third*, even if the Fund could receive a "double recovery" (which it cannot) we still must adhere to the statute's text. The Supreme Court recently emphasized this point in *Cunningham v. Cornell University*, 604 U.S. 693 (2025). There, a party encouraged the Court to avoid an interpretation of ERISA that would cause "an avalanche of meritless litigation" that could "harm the administration of plans." *Id.* at 707. The Court rejected that approach: "These are serious concerns but they cannot overcome the statutory text and structure." *Id.* at 708. Courts must "read" a statute "the way Congress wrote it." *Id.* (quoting *Meacham v. Knolls Atomic Power Lab'y*, 554 U.S. 84, 101–02 (2008)).

This court, too, has disclaimed a policy-driven approach when interpreting ERISA. *See Cont'l Can Co. v. Chi. Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund*, 916 F.2d 1154, 1160 (7th Cir. 1990). Even if a "double recovery"

could result, "disappointment with that result may supply a good reason for Congress to change the law; it does not provide a reason for a court to change the law." *Id.* (citation modified). Declining to engage with policy arguments when interpreting ERISA is not an outlier for this court. *Event Media Inc.*, 135 F.4th at 534; *Trs. of Chi. Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Leaseway Trans. Corp.*, 76 F.3d 824, 830–31 (7th Cir. 1996) ("[T]he Fund's broad policy arguments need not concern us.").

Next, SuperValu claims that relying solely on the text leads to a supposed "double recovery" for the Fund. This label loses sight of what the Fund might call "windfalls" for SuperValu. In particular, the 20-year cap, 29 U.S.C. § 1399(c)(1)(B), allows an employer who has paid its annual installments for that duration to stop paying, regardless of the balance remaining. *Milwaukee Brewery*, 513 U.S. at 420. That effect is dramatic in this case, reducing SuperValu's total withdrawal liability from about $42.7 million to about $22.6 million. *See supra* at 7. Under SuperValu's preferred reading, its payments would be reduced even further. Those unfunded vested benefits do not disappear. Instead, as the arbitrator observed, the calculation of SuperValu's withdrawal liability shifts those obligations to employers which remain in the Fund, forcing them to pay more than their fair share.

As a result, SuperValu's interpretation could cause positive and negative outcomes. It is not our role to prefer one outcome over another. That is a choice for Congress, which did not choose to prevent "double recovery" over other policy outcomes. "No statute pursues a single policy at all costs, and we are not free to rewrite this statute (or any other) as if it did." *Bartenwerfer v. Buckley*, 598 U.S. 69, 81 (2023). Rather, our

role is to interpret ERISA's text "the way Congress wrote it." *Cunningham*, 604 U.S. at 708.

To the contrary, SuperValu submits, we should place less weight on the text and more on the statute's "context," something it argues the district court did not do. Context, it is true, is an accepted interpretative inquiry. *Feliciano v. Dep't of Transp.*, 145 S. Ct. 1284, 1291 (2025). But an interpretation motivated by context can, at times, look more like an interpretation motivated by outcome.[3] Courts must therefore be careful in invoking context when interpreting statutes. *See King v. Burwell*, 576 U.S. 473, 497–98 (2015). If they are not, "attempted interpretation of legislation becomes legislation itself." *Id.* (quoting *Palmer v. Massachusetts*, 308 U.S. 79, 83 (1939)).

An example of contextual interpretation is *Thompson v. United States*, 604 U.S. 408, 415 (2025). There, the question was whether "false" could mean "misleading" in 18 U.S.C. § 1014. *Id.* at 410. In analyzing statutory context, the Court observed that "many other statutes" in Title 18 use both terms. *Id.* at 415. So did statutes enacted at the same time as § 1014. *Id.* at 416. That evidence suggested Congress recognized a difference between the two. *Id.* For statutory context, the Court concentrates on the text rather than on outcomes.

SuperValu's interpretation is not based on statutory context. Rather, it is concerned with preventing a particular

---

[3] HARVARD LAW SCHOOL, *2025 Scalia Lecture, Judge Rachel Kovner: Are We All Textualists Now?*, at 5:30 (YouTube, Apr. 2, 2025), https://www.youtube.com/watch?v=mrANZY9Xoko ("[W]hile the Court is loath to describe itself as reasoning from purpose, it does so in statutory interpretation cases not that infrequently, often under banners like context.").

outcome—"double recovery"—rather than the statute's text. That strays from a text-based inquiry, such as the Court's in *Thompson*. Properly viewed, SuperValu's reading is less like an "attempted interpretation of legislation" but more like "legislation itself." *Burwell*, 576 U.S. at 497–98.

### 3. *The presumption of consistent usage*

SuperValu invokes the presumption of consistent usage for further support. But that contextual canon does not support SuperValu's reading of the applicable ERISA statutes.

"Often … if a word is used in a similar context in two different places in the same enactment, judges will start with the assumption that the enacting legislature was using the word in the same sense in both places." CALEB NELSON, STATUTORY INTERPRETATION 125 (2d ed. 2024).[4] But the canon is a presumption that can be overcome if evidence in the text suggests Congress intended different meanings. *Med. Coll. of Wis. Affiliated Hosps., Inc.*, 854 F.3d at 933; NELSON, *supra*, at 124 ("[T]here are plenty of cases in which courts conclude that the presumption of consistent usage has been rebutted.").

Recall SuperValu's textual anchor for its argument. Withdrawal-liability § 4211 provides the method for calculating what a withdrawing employer owes. That section states the prior "contributions required to be made by the employer" should be considered. 29 U.S.C. § 1391(b)(2)(E)(ii)(II). SuperValu reads the word "employer" to implicitly mean "employer at the time of withdrawal." SuperValu sold its stores and then withdrew from the Fund. At that point, SuperValu

---

[4] Related is the *in pari materia* canon. We have used it and the presumption of consistent usage interchangeably. *Med. Coll. of Wis. Affiliated Hosps., Inc. v. United States*, 854 F.3d 930, 933 (7th Cir. 2017). We do so here.

had no obligation to contribute to the Fund for those Sold Stores. So, the contribution units for those Sold Stores are not included in the withdrawal-liability § 4211 calculation.

Then, SuperValu asserts, "contributions required to be made under the plan by the employer" (withdrawal-liability § 4211) and "for which the employer had an obligation to contribute" (payment-schedule § 4219), should be interpreted similarly under the presumption of consistent usage. For SuperValu, just as the former implicitly references safe-harbor § 4204, so too for payment-schedule § 4219. This similarity—and that each section is a step in the same calculation—permits the application of the presumption of consistent usage canon.

But simply because two statutory sections are part of a patchwork does not mean the presumption controls. "Courts routinely find that several acts treating the same subject, but having different objects, are not *in pari materia*." 2B NORMAN J. SINGER & J.D. SHAMBIE SINGER, SUTHERLAND STATUTES AND STATUTORY CONSTRUCTION § 51:3 (7th ed. 2012).

The two statutory sections here serve different objectives. Withdrawal-liability § 4211 provides the method to calculate *what* the employer must pay. By contrast, the payment-schedule § 4219 provides for *how* the employer will pay. The Supreme Court recognized this distinction in *Milwaukee Brewery* when the Court outlined the MPPAA's scheme. "*First*, how much is the withdrawal charge? … *Second*, how may the employer pay the withdrawal charge?" *Milwaukee Brewery*, 513 U.S. at 417–18. And a plain reading of the MPPAA supports this distinction: *what* one owes differs from *how* one pays that debt.

Withdrawal-liability § 4211 and payment-schedule § 4219 diverge in other ways. Each employs a different equation to achieve its objective. And the calculation in the operative provision of payment-schedule § 4219 does not reference withdrawal-liability § 4211. *See* 29 U.S.C. § 1399(c)(1)(C)(i)(I). Indeed, the former references the latter just once. *See id.* § 1399(c)(1)(A)(i). These textual differences show that Congress viewed these various statutes as serving different objectives.

SuperValu counters that this reading of these ERISA statutes leads to inconsistent interpretations of withdrawal-liability § 4211 and payment-schedule § 4219. But that counterargument falls short twice over.

First, SuperValu contends that withdrawal-liability § 4211 does deduct the contribution units from Sold Stores under safe-harbor § 4204. But this court has not held that, nor did the parties here ask us to rule on that contention. *Borden* so holds, and the PBGC letter supports that contention, but those authorities do not bind us. And though our decision in *CenTra* suggests that contention may be correct, that was not the holding in that case and thus remains unresolved in our circuit. Our holding here is confined to the overlap between payment-schedule § 4219 and safe-harbor § 4204.

Second, even if § 4211 were to require deducting contribution units from Sold Stores under safe-harbor § 4204, that does not justify imposing that same requirement on payment-schedule § 4219. The two sections are distinct for the reasons noted above. Each pursues a different objective, and they bear little similarity, other than that they fall under the general umbrella of plan withdrawals. So, while statutes should be read in harmony, that principle gives way when the common term

is "placed in different contexts." *Yates v. United States*, 574 U.S. 528, 537–38 (2015) (collecting examples).

**IV**

The text of the operative provision in payment-schedule § 4219 prescribes a detailed calculation. That text does not reference safe-harbor § 4204. Payment-schedule § 4219 therefore does not exclude the contribution base unit history for stores sold under safe-harbor § 4204. We agree with the district court that the text of the operative provision controls. We hold that applying payment-schedule § 4219 does not require the Fund to deduct the contribution units from the Sold Stores under safe-harbor § 4204.

AFFIRMED.